# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CAROL SUE KUSK,

        Defendant-Appellant.

UNPUBLISHED
February 11, 2016

No. 324107
Oakland Circuit Court
LC No. 14-249495-FH

Before: RONAYNE KRAUSE, P.J., and MARKEY and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right from her conviction of domestic assault, MCL 750.81(2), for which the trial court sentenced her to serve 93 days in jail, with credit for 13 days served. The jury found defendant not guilty of felonious assault, MCL 750.82, and possessing a firearm when committing or attempting to commit a felony (felony-firearm), MCL 750.227b. We reverse, and remand this case to the trial court for further proceedings.

## I. FACTS

This case arose from a disagreement between defendant and the victim, who was living in defendant's basement with two of her children, which lead to a series of physical altercations one evening. Aside from that fact, there is very little about which defendant and the victim can agree.[1] While living in defendant's basement, the victim did not pay rent or have a lease of any kind. However, the victim was expected to be respectful and follow certain rules, among them not to come upstairs without an invitation, and not to have male visitors after 10:00 p.m. It is undisputed that the victim had a male friend on the premises the night of the altercations. The victim testified that defendant sent her a text message indicating that the man needed to leave, and also that the victim needed to move out of the home in the next 30 days. The victim

---

[1] At trial, both the victim and defendant testified as to the order and severity of events that night. We have attempted to give what we believe is a complete portrayal of what occurred on the night in question, comprised of testimony from both parties. We note that the dissent seems to mention and rely heavily on testimony given by the victim, with little mention of defendant's account of what occurred.

explained that she went upstairs to discuss the text because it was not yet 10:00 p.m., and the news that she needed to move out upset her. It was at this point that a melee ensued. However, each combatant asserted that the other started the fight. According to defendant, she told the victim to go back downstairs because she had not been invited upstairs, at which point the victim hit her in the head. "She grabbed my hair along with my ear," defendant testified, "pulled my earring out, and just held me down and started beating me in my head and back." After the two were separated, defendant demanded that the victim move out in the next 10 minutes.

According to the victim, when she came back upstairs to get some laundry, defendant was holding a gun, and that as she was on her way back downstairs, defendant followed her and pointed the gun at her. Defendant did not deny holding a gun, but explained that she retrieved it only after the victim had assaulted her again. Defendant testified that the victim struck her in the face causing the defendant to hit her head against the corner of a wall. As her husband was holding defendant the victim grabbed defendant's hair and struck her again, resulting in the defendant's black eye. Defendant stated that the victim was also yelling that she was going to kill defendant. According to defendant, it was at this point that she retrieved her lawfully registered firearm, out of fear for her safety and the resulting need to protect herself from the victim. However, defendant was clear that she did not retrieve the gun until after the victim had returned to the basement and that at no point in the evening were the victim, the gun and defendant in the same room at the same time. Defendant said that her husband took the gun from her and she never had it in her possession again that evening.

The victim explained that defendant then came downstairs, unarmed, and physically attacked her and "that's why I did hit her multiple times because [defendant] kept on attacking me." Defendant testified that the victim again came up from the basement and again assaulted her. "She grabbed me by the hair and started punching me again and that's when I pulled her hair," defendant explained.

At trial, defense counsel repeatedly characterized defendant's position throughout the series of physical brawls as a defensive one. In his opening statement, counsel said that "[the victim] lost it. She came upstairs and she smacked my client. They got into a physical altercation following that." He also told the jury, "You'll hear unequivocally on this evening when the fight started [what the victim] did in response to being told that she had to move." In his closing argument, defense counsel argued as follows:

> There's no question that there was a fight here. You've seen pictures of [the victim's] hands. You've seen pictures of [defendant's] eye. Who looks like they got the worst of the fight? Basically, this is a simple question. Who do you believe started that? Because once you determine who started it, the other one who engaged is clearly trying to defend herself.

> So do you believe that while [defendant] was sitting in her living room and she sent a text telling someone to get out in 30 days she's inviting her to come up and fight? Or do you believe that [the victim] goes upstairs pissed, screams at her, then grabs her hand, then blackens her eye damaging her fist in the process? Which one do you think is more believable?

Defense counsel later asked, "Does the evidence show beyond a reasonable doubt that a [sic] unprovoked attack was initiated by [defendant] on [the victim] who lived in the same house[?]"

The trial court instructed the jury on felonious assault, domestic assault, and felony-firearm. The court set forth the elements of domestic assault as follows:

> First, that the defendant assaulted and/or assaulted and battered [the victim].
>
> A battery is the forceful, violent, or offensive touching of a person or something closely connected with him or her. The touching must have been intended by the defendant, that is, not accidental, and it must have been against [the victim's] will.
>
> An assault is an attempt to commit a battery or an act that would cause a reasonable person to fear or apprehend an immediate battery. The defendant must have intended either to commit a battery or to make [the victim] reasonably fear an immediate battery. An assault cannot happen by accident. At the time of an assault, the defendant must have had the ability to commit a battery, or must have appeared to have the ability, or must have thought she had the ability.
>
> Second, at the time [the victim] was a resident or former resident of the same household as the defendant.

## II. ANALYSIS

The sole issue on appeal is whether defendant was denied the effective assistance of counsel on the basis of a failure to request a jury instruction regarding self-defense. A claim of ineffective assistance of counsel presents a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Where there was no motion below for a new trial on the ground of ineffective assistance, *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000), or request for an evidentiary hearing to develop the issue, *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973), as is the case here, this Court's review is limited to mistakes apparent on the existing record. See *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

"A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden." *People v Carbin*, 463 Mich 590, 599; 623 NW2d 884 (2001). For a defendant to show that he or she was so deprived of the effective assistance of counsel "that it justifies reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003). However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 US at

690. Accordingly, a defendant pressing a claim of ineffective assistance of counsel "must overcome a strong presumption that counsel's assistance constituted sound trial strategy." *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999). To show prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

In this case, the prosecutor, and our dissenting colleague, maintain that trial counsel decided not to request a self-defense instruction for strategic reasons related to combating the felony charges; suggesting that a self-defense instruction would have been incompatible with the defense's position that defendant never pointed her gun at her aggressor or anyone else. Indeed, trial counsel may have chosen to focus more on the felonies involving defendant's use of her gun, and if so that strategy was clearly successful regarding the felony counts.

However, trial counsel clearly attempted to establish that defendant was in a defensive position throughout the entire confrontation, as indicated in defense's opening statement and closing argument mentioned above. We believe that inclusion of self-defense assertions by defense counsel at both ends of the trial rebut the idea that defense counsel avoided the jury instruction for fear of placing too much emphasis on an allegedly weaker claim of self-defense. Moreover, who the aggressor truly was is wholly independent from the factual question of whether defendant later pointed her gun at the victim. It seems unlikely that the jury would have been unable to distinguish the issues of who started the first fight, during which defendant had no gun, and whether defendant, having retrieved her gun in connection with a resumption of physical hostilities, pointed it at the victim.[2] Moreover, defense counsel could have underscored that distinction by asking for a self-defense instruction tailored specifically to the misdemeanor domestic assault charge. Because it is undisputed that the gun was not present during the first skirmish, emphasizing that defendant did not point the gun at anyone would have had no bearing on anything that took place during that first round of fighting. Regarding this first barrage of fisticuffs, self-defense was the only defense presented; therefore, omission of a corresponding jury instruction as a trial strategy is incomprehensible. In fact, defense counsel would have done well to put self-defense forward for the jury's consideration in the felony counts as well, in case the jury had concluded that defendant did in fact point the gun at the victim. For these reasons, we must conclude that defense counsel's failure to request a self-defense instruction was not part of trial strategy and was therefore an aspect of performance that fell below an objectively reasonable standard.

That defendant suffered prejudice from the error is apparent. It is certainly possible that the jury ultimately believed that defendant started the fight and retrieved her gun without a

---

[2] We disagree with the dissent's notion that a self-defense instruction leading to defendant's acquittal of domestic violence would somehow cause a conviction under one or both of the felonies, and that this was the fear of defense counsel and his reason for omission of the instruction. We find it entirely possible, and even probable, that had the instruction been provided to the jury, defendant would have been acquitted of all charges.

justifiable self-defense purpose, but simply never pointed it at the victim. However, the case was largely a credibility contest between defendant and the victim,[3] who both testified, and the jury's determinations of not guilty on the two felony counts weigh strongly in favor of a more likely conclusion that the jury found defendant to be the more credible of the two individuals. It is undisputed that there was a fight during which defendant pulled the victim's hair; defendant admitted this on the stand, thereby confessing to committing a domestic assault. However, the jury instructions as given did not allow for a finding of not guilty of domestic assault by reason of self-defense. Because of the defendant's confession on the stand, coupled with the jury's inability to consider self-defense, the jury really had no choice but to find defendant guilty of domestic assault. Under these circumstances, there certainly is a reasonable probability that the outcome of the case would have been different had a self-defense instruction been requested and provided to the jury.

## III. CONCLUSION

For these reasons, we conclude that defendant has put forth a meritorious claim of ineffective assistance of counsel. We therefore reverse her conviction of domestic assault and remand this case to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey

---

[3] The dissent asserts that "[defendant] was not a particularly good witness" and states that she was hostile on the stand and admitted that she had been drinking at the time of the incident. However, the dissent fails to include similar discrediting characteristics regarding the victim. For instance, the victim's statements admitting her own drinking that night, her contradictory testimony there were four fights, later changed to only three, and most alarming was her extensive testimony on direct exam regarding the text message and how it was the start of the altercation, including what it said and when she received it, contradicted on cross exam by the victim's statement: "I don't actually – didn't remember getting that text message until the day that we went to court." If the defendant is characterized as "not a particularly good witness," the victim may be characterized as a flat out bad one.

-5-