*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHELINE NICOLE LEFFEW,

Defendant-Appellant.

UNPUBLISHED
April 9, 2020

No. 343818
Arenac Circuit Court
LC No. 17-004120-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JEREMIAH JAMES LEFFEW,

Defendant-Appellant.

No. 344240
Arenac Circuit Court
LC No. 17-004119-FH

Before: BOONSTRA, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

In these consolidated appeals,[1] defendants appeal by right their convictions and sentences after a joint jury trial. In Docket No. 343818, defendant Micheline Leffew (Micheline) appeals her conviction of third-degree home invasion, MCL 750.110a(4), for which the trial court sentenced her to serve five months in jail followed by a two-year term of probation. In Docket No. 344240, defendant Jeremiah Leffew (Jeremiah) (Micheline's husband),[2] appeals his

---

[1] *People v Leffew*, unpublished order of the Court of Appeals, entered June 17, 2019 (Docket Nos. 343818 and 344240).

[2] Because defendants share the same surname, we will refer to them individually by their first names.

convictions of first-degree home invasion, MCL 750.110a(2), and assault with a deadly weapon (felonious assault), MCL 750.82. The trial court sentenced Jeremiah as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of 25 to 40 years for the home invasion conviction, and 2 to 8 years for the felonious assault conviction. We affirm in both dockets.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The events leading to the charges in this case began when Jeremiah, Micheline, and Jeremiah's mother, Donna Knezevich, went to Michael Porter's home on November 18, 2017, to pick up Knezevich's then-partner, Lisa Siebert.[3] Knezevich, Porter, and Siebert had been involved in romantic relationship; however, earlier that day Knezevich had called Siebert at Porter's house and proposed marriage to her. Siebert accepted, upsetting Porter.

According to Porter and Siebert, after Porter asked to have a moment to speak with Siebert and closed his front door, defendants began pounding on and kicking the doors and windows, and Jeremiah yelled that he was going to kill Porter. Porter called 911. Immediately after he hung up the phone, the back door "blew open" and someone came through the door. Porter testified that he "smacked the person that was coming in," who turned out to be Micheline, with an ashtray, temporarily incapacitating her. Porter testified that Jeremiah followed Micheline into the home and was "coming at" him, and that he punched Jeremiah "a couple times," at which point Micheline recovered and jumped on Porter's back, yelling, "Let's kill him, let's kill him." Porter testified that Jeremiah then grabbed a kitchen knife and tried to stab Porter, cutting Porter's wrist in the process. According to Porter, the attack ended when Knezevich yelled, and Jeremiah took Micheline out the front door.

Defendants testified to a different version of events. Both defendants testified that Siebert wanted to leave Porter's home, but he physically restrained her from doing so. Seeing this, defendants believed they needed to intervene. Micheline acknowledged kicking in the back door, but testified that after Porter struck her with an ashtray, she fell to the ground and had a seizure.[4] She awoke outside in the driveway and was taken to the hospital. Jeremiah testified that he came in after Micheline kicked in the door to find her in the midst of a seizure. He further testified that Porter attacked him while he was attending to Micheline. Jeremiah acknowledged picking up a steak knife from a counter, but testified that after picking up the knife, he only asked Porter to stop fighting and to let him and Micheline leave. Jeremiah testified that Porter agreed, and Jeremiah helped Micheline out of the house.

Jeremiah was initially charged with felonious assault, and Micheline was charged with third-degree home invasion. Both were offered agreements to plead to misdemeanor offenses before the preliminary examination, and both refused. At the conclusion of the preliminary examination, the district court authorized the additional charge of first-degree home invasion against Jeremiah.

---

[3] Knezevich and Siebert later married.

[4] Micheline testified that she suffers from epilepsy.

At trial, defendants' theory of the case was that their actions were justified by the need to rescue Siebert from Porter. The jury convicted defendants as described. At Jeremiah's sentencing, the trial court imposed an out-of-guidelines sentence for Jeremiah's home invasion conviction.

These appeals followed. Following his claim of appeal, Jeremiah filed a motion to remand for a *Ginther*[5] hearing regarding his trial counsel's effectiveness, arguing that his counsel had advised him to reject a plea offer before trial and that he was deficient at trial. This Court granted his motion.[6] After a *Ginther* hearing, the trial court concluded that Jeremiah's trial counsel was not ineffective and denied his motion for a new trial. Micheline also filed a motion to remand for a *Ginther* hearing, based solely on her counsel's trial performance; this Court denied her motion "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar."[7]

## II. DOCKET NO. 343818

Micheline argues that her trial counsel was ineffective for failing to request a jury instruction on defense of others and for failing to present certain evidence. We disagree.

A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law. We review a trial court's factual findings for clear error, and the ultimate constitutional issue de novo. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Because no *Ginther* hearing was held, our review is limited to the existing record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004); *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). However, in the context of determining whether remand for a *Ginther* hearing is warranted, we may consider evidence presented by defendant even if it is not part of the record. See *People v Moore*, 493 Mich 933, 933; 825 NW2d 580 (2013). We review de novo issues of statutory interpretation. See *People v Pinkney*, 501 Mich 259, 268; 912 NW2d 535 (2018).

To establish that trial counsel was ineffective, a defendant must show that counsel's performance was objectively unreasonable and that counsel's deficient performance prejudiced the defense. *People v Payne*, 285 Mich App 181, 188-189; 774 NW2d 714 (2009). Prejudice exists where a defendant is able to show a reasonable probability that, absent counsel's error, the result of the proceeding would have been different. *Id*. at 189. Counsel cannot be deemed ineffective for failing to raise a meritless argument, *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010), nor may counsel be deemed ineffective for failing to raise a novel issue, *People v Crews*, 299 Mich App 381, 400; 829 NW2d 898 (2013).

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] *People v Jeremiah James Leffew*, unpublished order of the Court of Appeals, entered January 24, 2019 (Docket No. 344240).

[7] *People v Micheline Nicole Leffew*, unpublished order of the Court of Appeals, entered March 12, 2019 (Docket No. 343818).

Micheline first argues that counsel was ineffective for failing to request a jury instruction on the affirmative defense of "defense of others." We disagree. Criminal defendants are entitled to have "a properly instructed jury consider the evidence . . . ." *People v Everett*, 318 Mich App 511, 527; 899 NW2d 94 (2017) (quotation marks and citation omitted). "Accordingly, jury instructions must include all the elements of the charged offenses and any material issues, defenses and theories that are supported by the evidence." *Id*. (quotation marks and citation omitted). If a defendant requests an instruction on a particular defense, and the defense would be supported by the evidence, the trial court must give the instruction. *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

Micheline was charged with third-degree home invasion. Under MCL 750.110a(4)(a), a person is guilty of third-degree home invasion if he or she "[b]reaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a misdemeanor." In this case, the misdemeanor underlying the charge of third-degree home invasion was malicious destruction of a building under $200, MCL 750.380(5).

MCL 780.972(2), part of the Self-Defense Act, MCL 780.971 *et seq*. (SDA), provides for the affirmative defense of "defense of others:"

> An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual.

Micheline cites no authority for the premise that this defense is available to excuse the crime of home invasion. Generally, the defense-of-others defense is used to excuse assaultive conduct, i.e., the use of force directly against a person. And the crime of third-degree home invasion does not require the "use of force other than deadly force against another individual," MCL 780.972(2). See MCL 750.110a(4) (stating that third-degree home invasion requires an intent to commit or commission of a misdemeanor). Moreover, a person who has entered a home without permission from the lawful owner appears by definition not to be "anywhere he or she has the legal right to be," MCL 780.972(2). See MCL 750.110a(4)(a), (b) (stating, with regard to third-degree home invasion, that the entry must be without the permission of the lawful owner). A plain reading of the statute suggests that a defendant cannot claim defense of others to excuse the commission of the non-assaultive crime of third-degree home invasion or the non-assaultive misdemeanor (malicious destruction of a building under $200) that supports that charge in this case. See *Pinkney*, 501 Mich at 268.

Given the apparent inapplicability of the statutory "defense of others" affirmative defense, MCL 780.972(2), Micheline argues that she was nonetheless entitled to assert a "defense of others" affirmative defense under the common law, and that her trial counsel therefore should have requested a jury instruction in accordance with the common law. We note in that regard that MCL 780.973 provides that "[e]xcept as provided in [MCL 780.972], this act does not modify the common law of this state in existence on October 1, 2006 regarding the duty to retreat before using deadly force or force other than deadly force."

Micheline addresses the common-law "defense of others" defense by analogizing to the related "self-defense" defense, and cites to *People v Dupree*, 486 Mich 693, 696; 788 NW2d 399 (2010), in which our Supreme Court held that "the traditional common law affirmative defense of self-defense may be interposed to a charge of being a felon in possession of a firearm, MCL 750.224f." Micheline argues that the "defense of others" defense should similarly be found to apply to the charge of home invasion in this case. But *Dupree* appears to be distinguishable, in that the felon-in-possession offense in *Dupree* occurred before the effective date of the SDA and the Supreme Court's holding in *Dupree* was that "*[b]ecause the SDA does not retroactively apply to conduct that occurred before its effective date*, the traditional common law affirmative defense of self-defense in existence before the enactment of the SDA governs." *Id*. at 708 (emphasis added; footnotes omitted). In this case, by contrast, the home invasion at issue occurred after the effective date of the SDA.

Micheline has failed to otherwise address the particulars of the common law or how it was or was not modified by the enactment of MCL 780.972, other than to note that the SDA "does not diminish an individual's right to use deadly force or force other than deadly force in self-defense or defense of another individual as provided by the common law of this state in existence on October 1, 2006." MCL 780.974. To the extent that Micheline argues that the common law defense of defense-of-others applies to her situation over and above the codification of the SDA, we have found no cases in which the common-law defense of self-defense or defense-of-others was applied in the context of a home invasion charge. At bottom, Micheline has failed to provide us with persuasive authority that the common-law "defense of others" defense applied to excuse the home invasion in this case. The applicability of the defense in this case is therefore far from certain, at best.

But the applicability of the defense is not the issue before us; nor is it whether a related jury instruction should have been given. Rather, the issue before us is whether defendant's trial counsel was ineffective in failing to request a "defense of others" jury instruction. We conclude, for the reasons noted, and notwithstanding that defense counsel may have succeeded in presenting a case at trial premised on Micheline having acted in defense of Siebert, that the defense case depended on a novel application of the law, and that it therefore would have been an even more novel legal argument for Micheline's counsel to have sought a jury instruction that effectively would have declared the law to be consistent with the defense presented. Simply put, the fact that a defense may have been presented does not mean that the law must be presented as if it conforms to that defense. See MCR 2.512 and 2.513; see also *People v Traver*, 502 Mich 23, 31, 34; 917 NW2d 260 (2018) (noting that a trial court must properly instruct the jury regarding the "applicable law" in manner that "fairly present[s] the issues to be tried[.]") (citations omitted). "Defense counsel cannot be deemed deficient for failing to advance a novel legal argument." *Crews*, 299 Mich App at 400.

Moreover, it does not appear that the failure to request this instruction had any effect on the jury's verdict. One of the elements of third-degree home invasion as charged in this case was that Micheline committed the misdemeanor of malicious destruction of a building under $200, MCL 750.380(5), by kicking in Porter's door. The trial court instructed the jury that to commit this offense, Micheline must have destroyed or damaged property "knowing that it was wrong, without just cause of [sic, or] excuse, and with the intent to damage or destroy the property . . . ." Micheline's trial counsel did not deny that Micheline broke the door, but argued that Micheline

-5-

had just cause to do so because she was attempting to protect Seibert. The jury's verdict indicates that, despite defense counsel's arguments, the jury rejected the theory that Micheline was justified in her actions; there is no reason to conclude that an instruction on defense of others would have altered that conclusion. We conclude that Micheline's defense counsel was not ineffective for failing to request this instruction. *Payne*, 285 Mich App at 188-189.[8]

Micheline also argues that her trial counsel should have impeached Porter's and Seibert's testimony with evidence that Porter pleaded to a misdemeanor offense arising from the same incident and that Seibert had petitioned for a personal protection order (PPO) against Porter. We disagree. The proposed impeachment evidence does not appear in the lower court record, and the trial court has not held an evidentiary hearing on the subject. However, we conclude that a remand for a *Ginther* hearing or to expand the record is not necessary. See *Moore*, 493 Mich at 933.

Defense counsel may be ineffective if he fails to "develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). But counsel's decisions regarding what evidence to present are presumed to be matters of trial strategy. *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). This Court does not "second-guess strategic decisions with the benefit of hindsight." *Id*. Further, the failure to present evidence "will only constitute ineffective assistance of counsel if it deprived defendant of a substantial defense." *Id*.

Micheline contends that counsel should have impeached Porter with evidence that he was charged with marijuana possession and domestic violence as a result of the encounter that led to the charge against her, and that he pleaded to possession of marijuana and being a disorderly person. She argues that this evidence, which she categorizes as bias or impeachment evidence, would be probative of whether she was justified in entering Porter's home to defend Seibert. But the jury was given substantial evidence regarding why Micheline believed she was justified in entering the home. Moreover, Porter's plea transcript shows that he admitted only to having an argument, which "became physical," with the people who "were breaking in[to] [his] home." It seems unlikely that this evidence would have substantially aided Micheline's case, especially when delving into the issue of Porter's charges and plea agreement may well have presented the jury with additional evidence supporting the charges against defendants. We conclude that Micheline has not overcome the presumption of trial strategy. *Dunigan*, 299 Mich App at 589-590.

Micheline also argues that Seibert alleged in her PPO application that Porter assaulted and physically restrained her during this encounter, and that this evidence should have been presented to impeach Seibert's trial testimony. We conclude that Micheline was not deprived of a substantial defense. Micheline and Jeremiah both testified that Porter physically assaulted and restrained Seibert. Further, Seibert's statements in the PPO application are similar to the statements she made to the police and at her preliminary examination. Seibert's preliminary examination testimony and police reports were admitted as impeachment evidence at trial, and Seibert was cross-examined concerning discrepancies in her testimony. The PPO application would have been cumulative of

---

[8] Further, although Micheline states in a footnote on appeal that "instructions on duress and necessity may also have been warranted," she fails to develop this argument and has abandoned it. See *McIntosh v McIntosh*, 282 Mich App 471, 484; 768 NW2d 325 (2009).

this other evidence that was presented, and there is no reason to believe that its admission would have changed the outcome of the proceedings. We conclude that defense counsel was not ineffective for not seeking to admit this evidence. See *People v Carbin*, 463 Mich 590, 603-604; 623 NW2d 884 (2001) (concluding that trial counsel was not ineffective for failing to present cumulative evidence).

## III. DOCKET NO. 344240

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Jeremiah argues that his trial counsel was ineffective in advising him to reject a plea offer before trial, and also for failing to request a jury instruction on defense of others. We disagree.

Jeremiah asserts that his trial counsel advised him to reject the prosecution's offer, made prior to the preliminary examination, to plead guilty to misdemeanor assault and battery in return for dropping the felonious assault charge. Jeremiah also contends that his counsel failed to advise him that rejecting the offer risked the prosecution pursuing additional felony charges, which indeed occurred when the prosecution added the home invasion charge at the conclusion of the preliminary examination.

As discussed, the trial court found, after the *Ginther* hearing, that Jeremiah's trial counsel was not ineffective. We agree with the trial court. After reviewing the record of the hearing, we cannot say that the trial court's factual findings were clearly erroneous. *Trakhtenberg*, 493 Mich at 47. At the hearing, Jeremiah's trial counsel testified that he explained to Jeremiah before the preliminary examination that the prosecution could possibly add more charges after the preliminary examination, and that there may be no further plea offers after that date. Counsel testified that he told Jeremiah that "we would have a very good case based on the circumstances in the police report" but did not tell Jeremiah he was guaranteed to win at trial. Jeremiah was also familiar with the plea-bargaining process, as he had accepted a plea offer in an earlier, unrelated prosecution. While there was some conflicting testimony at the evidentiary hearing, the trial court's factual conclusions are entitled to deference. *People v Geno*, 261 Mich App 624, 529; 683 NW2d 687 (2004). We conclude that Jeremiah has failed to establish that his counsel's performance fell below an objective standard of reasonableness. See *Lafler v Cooper*, 566 US 156, 163; 132 S Ct 1376; 182 L Ed 2d 398 (2012); *Trakhtenberg*, 493 Mich at 51.

Jeremiah also argues that his counsel should have requested a jury instruction on defense of others, based on his theory that he had acted to protect Micheline. As discussed with regard to Micheline, Jeremiah cites no authority for the assertion that defense of others is available as a defense to home invasion. With regard to that charge, his counsel was not ineffective for failing to raise a novel argument. *Crews*, 299 Mich App at 400. With regard to the felonious assault charge, a defendant cannot claim self-defense or defense of others if he was the initial aggressor. *People v Riddle*, 467 Mich 116, 119, 120 n 8; 649 NW2d 30 (2002). Porter testified that Jeremiah threatened to kill him while defendants pounded on his windows and doors; according to Porter, after Micheline broke the door and he hit her with the ashtray, Jeremiah "came at" him, causing Porter to respond by punching him, to which Jeremiah responded in turn by grabbing a knife and attempting to stab Porter. By contrast, Jeremiah testified that he came into the home after hearing Micheline kick in the door, and found her lying on the ground in the midst of a seizure. Jeremiah testified that Porter began punching him, but that Jeremiah did not respond to the attack. Rather,

he attended to Micheline. At some point, he picked up a knife and asked Porter to stop fighting and let them leave, which Porter did. Neither version of events supports the claim that Jeremiah was defending Micheline from "the imminent unlawful use of force" by Porter. MCL 780.972(2). There is no indication, under either version of events, that Micheline was under any threat of physical assault by Porter at the time Jeremiah gained possession of the knife.[9] In any event, as discussed in Docket No. 343818, there is, at a minimum, serious doubt as to whether a defendant in Jeremiah's situation could claim that he was somewhere he had "the lawful right to be" after invading a dwelling. We conclude that Jeremiah's counsel was not ineffective for failing to request this instruction.

## B. SENTENCING

Jeremiah's also argues that his out-of-guidelines sentence[10] for first-degree home invasion is disproportionate. We disagree.

Challenges to the proportionality of a defendant's sentence must be reviewed for reasonableness. *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015). We review for an abuse of discretion the reasonableness of a trial court's out-of-guidelines sentence. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). An abuse of discretion exists if the results are outside the range of reasoned and principled outcomes. *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010).

When reviewing an out-of-guidelines sentence for reasonableness, we must review "whether the trial court abused its discretion by violating the principle of proportionality set forth in [*People v Milbourn*, 435 Mich 630, 461 NW2d 1 (1990)]." *Steanhouse*, 500 Mich at 477. A trial court abuses its discretion "in applying the principle of proportionality by failing to provide adequate reasons for the extent of the [out-of-guidelines] sentence imposed . . . ." *Id*. at 476. However, our Supreme Court has cautioned us that the principal of proportionality does not require a trial court to "sentence defendants with mathematical certainty." *People v Smith*, 482 Mich 292, 311; 754 NW2d 284 (2008). "Nor are any precise words necessary" for a trial court to justify a particular departure; rather, the trial court's reasoning must be "sufficiently detailed to facilitate

---

[9] Jeremiah does not argue that his counsel was ineffective in failing to request an instruction regarding self-defense, which in any event would suffer from the same issues concerning Jeremiah's status as the initial aggressor and his lack of legal right to be in Porter's home.

[10] Historically, minimum sentences that exceeded the range of sentences recommended by the sentencing guidelines have been referred to as "departure sentences." However, in light of the fact that the sentencing guidelines are now advisory (although still relevant to a trial court's sentencing determination), we believe it more accurate to refer to the challenged sentence as an "out of guidelines sentence" because the framework for reviewing such sentences post-*People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015), differs significantly from that which existed when the sentencing guidelines were mandatory. See *People v Lampe*, 327 Mich App 104, 133-135; 933 NW2d 314 (2019) (BOONSTRA, J., concurring); see also *People v Odom*, 327 Mich App 297, 301-303, 307, 309-310; 933 NW2d 719 (2019) (referring to the defendant's sentence as an "out-of-guidelines sentence").

appellate review." *Id.* Our Supreme Court has held that the sentencing guidelines are now "advisory only," *Lockridge*, 498 Mich at 365, or "merely advisory," *id.* at 395 n 31. To be sure, they "remain a highly relevant consideration in a trial court's exercise of sentencing discretion that trial courts must consult and take . . . into account when sentencing." *Id.* at 391. But our Supreme Court has emphasized that "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Steanhouse*, 500 Mich at 475, quoting *Milbourn*, 435 Mich at 661. And the Court has specifically disavowed "dicta in our proportionality cases [that] could be read to have urg[ed] that the guidelines should almost always control" and that thus could be interpreted as "creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Steanhouse*, 500 Mich at 474 (quotation marks and citations omitted; second alteration in original). The *Steanhouse* Court also specifically disavowed the statement in *Milbourn* that departure sentences should " 'alert the appellate court to the possibility of a misclassification of the seriousness of a given crime by a given offender and a misuse of the legislative sentencing scheme.' " *Id.*, quoting *Milbourn*, 435 Mich at 659. "Rather than impermissibly measuring proportionality by reference to deviations from the guidelines, our principle of proportionality requires 'sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 500 Mich at 474, quoting *Milbourn*, 435 Mich at 636. See also *People v Walden*, 319 Mich App 344, 352; 901 NW2d 142 (2017); *People v Dixon-Bey*, 321 Mich App 490, 532-533; 909 NW2d 458 (2017) (BOONSTRA, J., concurring in part and dissenting in part).

Many factors may be relevant to a sentence's proportionality, including but not limited to:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lawhorn*, 320 Mich App 194, 207; 907 NW2d 832 (2017).]

When reviewing sentences for reasonableness, the sentencing guidelines should be used "as an aid when doing so assists in determining whether a sentence is proportionate." *Dixon-Bey*, 321 Mich App at 531. The sentencing guidelines, as calculated by the trial court, called for a minimum sentence of 72 to 180 months (i.e., 6 to 15 years) for first-degree home invasion.[11] The trial court, however, sentenced Jeremiah to a term of 25 to 40 years' imprisonment. The trial court cited a number of factors in imposing this out-of-guidelines sentence: (1) that it did not find Jeremiah's testimony credible and that it believed Jeremiah had "repeatedly perjured" himself during trial, (2) that Jeremiah had a history of violent behavior and serious offenses, including prior convictions for domestic violence and criminal sexual conduct, (3) that Jeremiah had violated probation in the past, (4) that Jeremiah was involved in assaultive behavior while in jail awaiting

---

[11] Jeremiah did not contest the scoring of the guidelines variables at sentencing, and does not do so on appeal.

sentencing,[12] (5) the trial court's belief that what occurred on November 18, 2017 was "a calculated event" and not an instance in which Jeremiah was attempting to rescue anyone, and (6) the trial court's belief that had Micheline not been in need of help, Jeremiah would have done much worse to Porter. The trial court also noted that Porter had alleged that he was threatened by an unidentified person after trial, and that if Jeremiah was in any way responsible for those threats, he would be held responsible. Ultimately, the trial court explained:

> For all the reasons I've just stated, your long violent history; your lack of self[-]control, even incarcerated; your lack of ability to control your violent tendencies; it's my intention to exceed the sentencing guidelines. I don't have to justify that as I did in the past. But I certainly think there are clear and convincing reasons, compelling reasons to exceed the sentencing guidelines. Given your history, your habitual supplement here, your habitual 3rd offender, almost all of your criminal history is violent, and that violence continues even after this conviction.

> So I am going to sentence you to the Michigan Department of Corrections for 300 to 480 months, that's 25 to 40 years . . . .

Jeremiah generally argues that many of the trial court's cited factors were accounted for by the sentencing guidelines; however, the specific argument Jeremiah makes is that the trial court could have accounted for his assault on another inmate in jail by assigning 25 points to Offense Variable (OV) 19, MCL 777.49(a), as conduct that threatened the security of a penal institution. He offers no analysis of the issue, and has thus abandoned the argument. *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009). Further, it is not clear that the trial court could have assessed any points under OV 19. In *People v Carpenter*, 322 Mich App 523, 526-527, 530-531; 912 NW2d 579 (2018), this Court stated that "*even if a fight between inmates might be found insufficiently related to the security of the penal institution at large*, [the] defendant's retaliatory attack on an inmate who he believed had informed on him definitely threatened the security of the jail . . . ." (Emphasis added). In contrast to the assault in *Carpenter*, an unexplained assault on another inmate, without more, is not necessarily sufficient to assign 25 points to OV 19. Consequently, it is not clear that the sentencing guidelines are capable of taking into account Jeremiah's assaultive conduct while in jail. Jeremiah makes no other specific arguments concerning the factors cited by the trial court being accounted for by the sentencing guidelines.

The record shows that the trial court explained at length the reasons for the out-of-guidelines sentence it imposed. The trial court noted Jeremiah's long history of violence, including that fact that he had in at least one case pleaded to domestic violence in return for the dismissal of a charge of assault by strangulation. It noted that Jeremiah had continued to be violent in jail and had made the comment, "I've got nothing to lose." The trial court also noted that alternative methods such as probation had failed in the past. In sum, the trial court concluded, based on the evidence, that Jeremiah was extremely prone to violence, lacked the ability to control himself

---

[12] The presentence investigation report indicates that Jeremiah punched another inmate in the face, for no apparent reason, causing facial injuries that would have required medical treatment had the inmate been willing to receive treatment.

regardless of his situation (including being imprisoned or on probation), and was, as the trial court put it, "a ticking time bomb."

At oral argument, the prosecution acknowledged that to the extent the trial court based its holding on its belief that Jeremiah had offered perjured testimony, that constituted error. The prosecution also noted that the trial court may have suggested that Jeremiah was armed when he entered Porter's home, although the evidence at trial showed that Jeremiah had armed himself with a knife from Porter's kitchen.[13] Because Jeremiah did not object to the trial court's use of allegedly inaccurate information at sentencing, this issue is not preserved for appeal. *People v Phillips*, 227 Mich App 28, 38; 575 NW2d 784 (1997). And, because Jeremiah did not raise these objections on appeal, we need not consider them. See *People v Stanaway*, 446 Mich 643, 694; 521 NW2d 557 (1994). Nonetheless, in the interest of fairness to Jeremiah, we will consider the issues raised by the prosecution at oral argument. We find no error requiring reversal.

Our Supreme Court has stated that a trial court may not punish a defendant for perjury by increasing his sentence on the underlying offense; however, a trial court may consider a defendant's perjury in the context of determining his rehabilitative potential, if the record contains a "rational basis for the trial court's conclusion that the defendant's testimony amounted to wilful, material, and flagrant perjury." *People v Adams*, 430 Mich 679, 693; 425 NW2d 437 (1988). At sentencing, the trial court stated that Jeremiah had been "evasive" and unable to answer some of its questions at trial, and told Jeremiah that his "story" had "a lot of holes." The trial court then stated that the witness testimony at trial supported its conclusion that, contrary to Jeremiah's testimony, "this was a calculated event" and "nobody needed rescuing;" the court cited to Porter's and Seibert's testimony that Seibert was not being held captive, had access to her car, and could have left the premises any time she wanted. The court then concluded that Jeremiah had "repeatedly perjured" himself.

We conclude that the record contained a rational basis for the trial court's conclusion as articulated. *Id.* The trial court noted specific instances in which Jeremiah testified in direct

---

[13] The prosecution also offered that the trial court had not allowed Jeremiah to respond to its statements that (1) Jeremiah had a previous conviction for domestic violence that was the result of a plea bargain from a charge of assault by strangulation and (2) that Porter had been the subject of threats. On our review of the record, however, Jeremiah did not object to the trial court's statement regarding his previous conviction, and in fact his defense counsel had stated earlier that the Department of Corrections had made "a truthful and accurate report" (i.e., the presentence investigation report (PSIR)). The PSIR contained the information that Jeremiah had previously been charged with assault by strangulation and had pleaded to domestic violence with the assault charge dropped. The record indicates that the trial court relied on accurate information in making this statement. *Phillips*, 227 Mich App at 38. Regarding the threats allegedly made to Porter, the trial court did not ascribe those threats to Jeremiah; rather, it merely stated that *if* anything happened to Porter, the trial court would make sure Jeremiah answered for it. Jeremiah responded, "I have no knowledge of anything like that." Although the trial court did not permit further colloquy on the subject, there is no evidence that the trial court relied on these threats in imposing its out of guidelines sentence, or that it made a factual finding to which Jeremiah should have been permitted to object.

contradiction to other witnesses. Having waived his right to remain silent and chosen to testify, Jeremiah was required to testify truthfully; "there is no right, constitutional or otherwise, to testify falsely[.]" *Id.* at 694. And the trial court could consider Jeremiah's willingness to give false testimony in determining his potential for rehabilitation. *Id.* at 693.

Regarding the trial court's statement that Jeremiah was armed with a knife when he entered the house, the trial court said to Jeremiah, "I believe what Mr. Porter says that this was probably planned, because you went there loaded for bear, you walked in the backdoor [sic], you busted in the backdoor [sic], and you immediately began assaulting Mr. Porter. You had a knife in your hand." It is not clear from context whether the trial court's use of the colloquialism "loaded for bear" specifically referred to Jeremiah being armed when he entered the home, rather than merely meaning "being prepared for a fight." Moreover, because Jeremiah did, at some point during the encounter, have a knife in his hand, it is not clear whether the trial court actually erroneously believed that Jeremiah was armed with a knife when he entered the home. In any event, even if the trial court misstated a portion of the evidence presented at trial, we find that error to be harmless. The trial court noted several other pieces of evidence that led it to believe that Jeremiah had planned to do violence to Porter before the encounter and it is unlikely, based on the record as a whole, that its conclusion would have been altered had it been reminded that Jeremiah had obtained a knife from the kitchen rather than bringing it with him. See *People v Lee*, 434 Mich 59, 86; 450 NW2d 883 (1990), citing MCR 2.613(A).

Given the evidence on the record,[14] we conclude that the trial court articulated sufficient support for the out-of-guidelines sentence it imposed, and further that the trial court acted within its discretion and imposed a reasonable sentence, *Lockridge*, 498 Mich at 365, that was proportionate to the seriousness of the circumstances surrounding the offense and the offender, *Steanhouse*, 500 Mich at 460. See also *Walden*, 319 Mich App at 353-354.

Affirmed in both dockets.

/s/ Mark T. Boonstra
/s/ Jonathan Tukel

---

[14] Although the trial court did not reference it explicitly at sentencing, Porter testified at trial to a previous incident a few days before the events of November 18 in which Jeremiah picked up a knife during an argument with Porter and "lunged" at him "two or three times," prompting Porter to call the police. It does not appear that any charges were filed as a result of this incident, possibly because, as Porter stated, he did not inform the police that a knife was involved.